IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff.

v.                                               No. 24-CR-539-DHU

LABAR TSETHLIKAI,

        Defendant.

## MR. TSETHLIKAI'S EMERGENCY MOTION TO STAY PROCEEDINGS

At 12:01 am today, the federal government shut down.[1] As a result, Learned Counsel and critical defense experts must severely limit or pause their representation of Labar Tsethlikai, leaving him stripped of rights guaranteed to him by the United States Constitution. Because of the United States Government's inability to fund his defense, Defendant Labar Tsethlikai, through counsel, Hadley Brown, Aric Elsenheimer and Andrea Luem, and pursuant to the Sixth and Eighth Amendments to the United States Constitution, *Gideon v. Wainwright*, 372 U.S. 335 (1963), *Ake v. Oklahoma*, 470 U.S. 68 (1985), and the Criminal Justice Act (CJA), 18 U.S.C. § 3006A and 18 U.S.C. § 3005, respectfully moves this Court for an *immediate stay* in this death penalty prosecution.

---

[1] *See* NPR, The federal government has shut down. Here's what will be affected across the country, (Oct. 1, 2025), https://www.npr.org/2025/09/30/g-s1-90732/government-shut-down (last visited Oct. 1, 2025).

RELEVANT BACKGROUND

On July 3rd, 2025, the federal government ran out of funds to compensate CJA attorneys and experts.[2] Because Mr. Tsethlikai's defense team is hybrid in nature, this lack of funding directly and severely impacted CJA funded Learned Counsel and Mitigation Experts who have received no compensation for work performed on this case in over 3 months. Despite this depletion of CJA funding, Learned Counsel and Mitigation Experts continued to work on Mr. Tsethlikai's case on a limited basis with the promise of payment when the budget was replenished on October 1, 2025. This promise proved empty.

As of the filing of the instant Motion, no comprehensive budget nor continuing resolution (CR) are in place and funding for CJA work remains depleted with no indication when that may change. These critical team members can no longer continue to work for free or pay expenses out of their own pocket. And the problem has worsened. With the government shutdown, the members of Mr. Tsethlikai's defense team who work for the Federal Defender's Office are expected to stop being paid for their work unless a budget or continuing resolution is passed. With no funding for Mr. Tsethlikai's defense, no member of his team will be paid for their work – not attorneys, learned counsel, investigators, mitigation specialists, paralegals, or experts.

---

[2] *See* U.S. Courts, Funding Crisis Leaves Defense Lawyers Working Without Pay, U.S. Courts (July 15, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay (last visited Oct. 1, 2025).

THE SIXTH AMENDMENT'S GUARANTEE TO A MEANINGFUL DEFENSE

The Sixth Amendment guarantees that: "In all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has held this to mean "that …. counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived." *Gideon v. Wainwright*, 372 U.S. 335, 339–40 (1963). In *Gideon* the Court explained:

> The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. *This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.*

*Id*. at 344 (emphasis added).

Since then, the Court has held that criminal defendants are not only guaranteed the right to counsel but entitled to effective representation and provided access to the tools necessary for a meaningful defense. *See Ake v. Oklahoma*, 470 U.S. 68, 76 (1985) (listing cases). As the Court unequivocally explained in *Ake*:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and *that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense*. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system. *To implement this principle, we have focused on identifying the basic tools of an adequate defense or appeal, and we have required that such tools be provided to those defendants who cannot afford to pay for them.*

*Id*. at 77 (cleaned up) (emphasis added).

MR. TSETHLIKAI'S CAPITAL DEFENSE CANNOT OPERATE WITHOUT LEARNED COUNSEL AND/OR MITIGATION EXPERTS.

A person indicted in federal court for any death-eligible offense is entitled to appointment of two attorneys, at least one of whom must be "learned in the law applicable to capital cases." 18 U.S.C. § 3005. Judicial Conference policy is that "[o]rdinarily, 'learned counsel' should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation." Recommendation 1(b), Subcommittee on Federal Death Penalty Cases, Committee on Defender Services Judicial Conference of the United States, Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense (approved September 15, 1998). More than two attorneys can be appointed to represent a defendant in a capital case. 18 U.S.C. § 3599(a). In addition to the "learned counsel" requirement of §3005, minimum experience standards for attorneys appointed in capital cases are set forth in 18 U.S.C. § 3599(a)-(d). Procedures for appointment of counsel and attorney qualification requirements are further detailed in [Guide to Judiciary Policy, Volume 7A, § 620 (Appointment of Counsel in Capital Cases)](#).

Highly skilled and experienced counsel is critical at every stage of a federal death penalty proceeding, and it is important from the outset of a case that death-qualified counsel be appointed to provide representation to defendants charged with a capital crime. Judicial Conference policy makes clear that "[q]ualified counsel must be appointed in capital cases at the earliest possible opportunity." Guide to Judiciary Policy, Vol. 7A, Appx. 2A.

An essential aspect of death penalty defense litigation and the "high quality legal representation" required in capital cases is the building and use of a dedicated and well-functioning team of professionals from various fields. In addition to counsel, the team must include, at a minimum, one or more mitigation specialists, fact investigators, and one member who is able, by experience and training, to screen for the presence of mental or psychological disorders or impairments. *See* American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003), Guideline 10.4. ("ABA Guidelines").

BECAUSE "DEATH IS DIFFERENT," THE EIGHTH AMENDMENT REQUIRES AN INDIVIDUALIZED SENTENCING DETERMINATION BY A HEIGHTENED RELIABILITY STANDARD.

The fundamental truth that "death is different" is a bedrock principle of our criminal jurisprudence which "is always a consideration in the handling of death [penalty] cases." *Buntion v. Quarterman*, 524 F.3d 664, 675 (5th Cir. 2008). Accordingly, the Supreme Court has "imposed protections [in death penalty cases] that the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957, 993 (1991).

A foundational protection is that of "heightened reliability." *Woodson v. North Carolina* (1976) 428 U.S. 280, 305. (Powell, J.) ("Because of that qualitative difference [between a sentence of life and death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"). Simply stated, "[t]he finality of the death penalty requires 'a greater degree of reliability' when it is imposed." M*urray v. Giarratano*, 492 U.S. 1, 8-9 (1989) (internal citation omitted).

Another foundational protection in capital cases is the requirement for individualized sentencing. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978). In *Lockett*, the Supreme Court observed that because "the imposition of death by public authority is so profoundly different from all other penalties . . . an individualized decision is essential in capital cases . . . [and] far more important than in noncapital cases." *Id.*

Thus, both the Constitution and the Federal Death Penalty Act require that the jury may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); 18 U.S.C. § 3592(a) (providing that the sentencing jury "shall consider any mitigating factor, including the following [seven specific factors and a 'catch-all' factor]"). *See also Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances").  The Supreme Court has defined the jury's task as weighing "the finite aggravators against the potentially infinite mitigators." *Ayers v. Belmonte*, 549 U.S. 7, 21 (2006). *See also Woodson*, 428 U.S. at 303-04 (emphasizing "the diverse frailties of humankind."); *Skipper v. South Carolina*, 476 U.S. 1, 6 (1986) (defining mitigation as "anything which might lead a reasonable juror to conclude that life is the appropriate punishment").

Reliable investigation of a client's background, character, life experiences (including trauma), and mental health is "axiomatic in the defense of a capital case." *United States v. Bowers*, 18-cr-00292-DWA (W.D. Pa.), Doc. 404-3. Investigation is an integral part of the defense function generally. *See* American Bar Ass'n STANDARDS FOR CRIMINAL JUSTICE (2d ed.1980), Standard 4.4-1, 4:53 ("It is the duty of the

6

lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."); *see also id*. at 4:54 ("Facts form the basis of effective representation."). Both the standards for practice and Supreme Court precedent establish the centrality of a robust investigation in a death penalty defense.

The seminal works in the field have recognized the importance of mitigation investigation since the seventies and eighties. *See*, e.g., Dennis N. Balske, New Strategies for the Defense of Capital Cases, 13 AKRON L. REV. 331, 358 (1979) ("Importantly, the life story must be complete."); Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. REV. 299, 323-324 (1983) ("The importance of this investigation, and the care with which it is conducted, cannot be overemphasized."). The ABA later developed guidelines specific to capital defense practice, which courts have regularly applied in assessing the reasonableness of counsel's performance. *See Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (citing cases) ("We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'"). The Supreme Court has called these guidelines "valuable measures of the prevailing norms of effective representation." *Id*. at 367.

Between 2000 and 2010, the U.S. Supreme Court found trial counsel ineffective in multiple death-penalty cases for failing to conduct adequate mitigation investigation: *Williams v. Taylor*, 529 U.S. 362, 395-99 (2000); *Wiggins v. Smith*, 539 U.S. 510, 535-38 (2003); *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005); *Porter v. McCollum*, 558 U.S. 30, 39-44 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945, 948-56 (2010) (per curiam). Each case reiterates the centrality and importance of a comprehensive

7

mitigation investigation and presentation in a capital case. The High Court reaffirmed the duty to investigate mitigation evidence thoroughly in *Andrus v. Texas*, 590 U.S. ___, 140 S. Ct. 1875, 1882-87 (2020) (per curiam), a case tried in 2012. The Court has cautioned against counsel making decisions in life-or-death cases "having acquired only rudimentary knowledge of [a client's] history." *Wiggins*, 539 U.S. at 524.

Accordingly, although the issues raised in this pleading are, in varying degrees, applicable to non-capital cases, they must be analyzed here through a "death is different" lens and do not have the same impact outside the capital context. *See*, e.g., *Sampson v. United States*, 832 F.3d 37, 43 (1st Cir. 2016) (noting that "an already significant legal question is even more so in the context of a capital case, because 'death is different.'"); *United States v. Lopez-Matias*, 522 F.3d 150, 158 (1st Cir. 2008) ("We do believe that when the stakes are so high, a smaller quantum of prejudice may justify a sanction").

THESE EIGHTH AMENDMENT STANDARDS DEMAND A THOROUGH, IN-PERSON MITIGATION INVESTIGATION BASED ON DETAILED RECORDS COLLECTION AND REVIEW AND CAREFUL DEVELOPMENT OF WITNESS RAPPORT.

Because death is different, "so too are the lengths to which defense counsel must go in investigating a capital case." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015) (citations omitted). Counsel must exhaustively explore every aspect of the "defendant's character ... and any of the circumstances of the offense." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). *See also Wiggins*, 529 U.S. at 396 (reversing based on counsel's failure to "fulfill their obligation to conduct a thorough investigation of the defendant's background.").

To meet these fundamental capital defense practice standards, the ABA Guidelines require comprehensive records collection and multiple in-person meetings

with clients and witnesses in both fact and mitigation investigation. *See* American Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003) ("Guidelines") Guideline 10.7; American Bar Ass'n, Supplementary Guidelines for the Mitigation Function of Defense Teams in Capital Cases, 36 HOFSTRA L. R EV. 677 (2008) ("Supplementary Guidelines"), Guideline 10.11. Specifically, Supplementary Guideline 10.11 addresses the "requisite mitigation functions of the defense team," which include:

- undertaking an "ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record…or other factors which may provide a basis for a sentence less than death" 10.11(B);

- conducting "in-person, face-to-face, one-on-one interviews" with biopsychosocial history witnesses or any witness "who would support a sentence less than death,"

- "[m]ultiple interviews [which] will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation" 10.11(C);

- uncovering comprehensive documentary evidence of the client's biopsychosocial history for counsel's use, 10.11(D);

- aiding counsel with the selection and preparation of testifying witnesses, lay and expert, 10.11(E);

- gathering documentary support for lay and expert witness testimony, including biopsychosocial history records, 10.11(F), and aiding counsel in gathering and preparing demonstrative evidence that "humanize the client or portray him positively" 10.11(G). "The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." Guideline 10.7 cmt.6.

Many topics that must be explored in a mitigation investigation are highly sensitive. A competent mitigation investigation will invade often shameful family secrets like mental illness, substance use, domestic abuse, sexual abuse, and trauma. A mitigation investigation can be a prolonged invasion into the privacy of a client and

those close to him or her. To obtain reliable mitigating evidence, the mitigation specialist must treat potential witnesses professionally, recognize and respect the barriers at play, and commit the time it takes to gain their trust and develop rapport. Rapport is developed through multiple, in-person meetings with witnesses. A single meeting is rarely sufficient. Rather, "multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation." Supplementary Guidelines 10.11(C).

      The mitigation investigation for Mr. Tsethlikai's case has already been compromised by the ongoing CJA funding crisis. At the present time, and for the foreseeable future, it is stalled because the defense continues to be unable to pay mitigation specialists. A mitigation investigation in a death penalty case is always an enormous operation. The mitigation investigation in this case is especially complex and time-consuming. The outstanding mitigation work in this case is daunting; it will require a great deal of time and energy from specialists trained in the field. With no funding for this essential part of Mr. Tsethlikai's defense, the team cannot continue to meet with critical mitigation witnesses, or pursue and digest records, or engage in numerous other mitigation investigation tasks. Mr. Tsethlikai's mitigation investigation is unconstitutionally prejudiced because of this lack of resources.

      As a result, counsel have grave concerns about the ability to effectively represent Mr. Tsethlikai as required by the Sixth Amendment and to uncover the necessary mitigating information for the jury to make the individualized determination with the "heightened reliability" required by the Eighth Amendment. *See Ford v. Wainwright*, 477 U.S. 399, 414 (1986) (Court's consideration of capital cases has been characterized by "heightened concern for fairness and accuracy"); *Lockett v. Ohio*, 438 U.S. 586, 603-

10

05 (1978) (requiring consideration of all relevant mitigating evidence to avoid "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty").

THE ABILITY TO OBTAIN NECESSARY EXPERT SERVICES HAS BEEN HALTED BY THE FAILURE TO FUND DEFENDER SERVICES AND CJA.

While there are many ways the United States's funding crisis is directly and indirectly affecting Mr. Tsethlikai's defense, one of them has been defense counsel's recent inability to retain and pay experts. The defense team has identified, vetted, and met with several experts who are critical to his defense, but because of the lack of CJA funds and the fact that the Federal Defender Office has no money in its budget for additional experts, the defense team is not able to move forward with retaining these experts. Without funding, the defense team also lacks the ability to pay the experts it has already hired for their work.

The continuation of this prosecution is constitutionally intolerable as long as there is no funding for defense counsel and defense experts. Congress's failure to fund Mr. Tsethlikai's defense means a deprivation of his right to counsel while the government seeks his death. A stay of the proceedings is required until funding for both CJA and Defender Services is adequately restored.

THE APPROPRIATE REMEDY IS AN IMMEDIATE STAY OF THIS DEATH PENALTY PROSECUTION.

"Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). The approach taken by the courts "has thus been to identify and

then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id.* at 365. "[T]he constitutional infringement identified" must threaten or present "some adverse effect upon the effectiveness of counsel's representation" to warrant a judicial remedy. *Id.* Without evidence of a prejudicial "impact on the criminal proceeding … there is no basis for imposing a remedy" in a case that can otherwise "go forward with full recognition of the defendant's right to counsel and to a fair trial." *Id.*

In this case, the prejudice Mr. Tsethlikai faces is immediate. The failure to fund CJA attorneys, federal defenders, experts, and other service providers creates a situation in which Mr. Tsethlikai is left without the resources necessary to mount a meaningful defense in the death penalty prosecution against him. Mr. Tsethlikai's case exemplifies the constitutional harm *Morrison* warns against. Defense counsel is expected to represent Mr. Tsethlikai without compensation and without the ability to conduct a thorough investigation or consult with adequately funded and necessary experts. These are not abstract grievances or inconveniences; these are violations of his Constitutional rights as a U.S. citizen.

Indeed, the core of the Sixth Amendment, *Gideon v. Wainwright*, and the CJA is the right to a meaningful defense; however, a defense can only be meaningful if it is funded. The CJA funding crisis and subsequent government shutdown are resulting in constitutional injury with direct and adverse effects on counsel's ability to render effective assistance. A system in which CJA counsel and CJA service providers are expected to bankroll the criminal defense of federally prosecuted clients from personal business funds or by going into debt is fundamentally incompatible with the promises of the Sixth Amendment. Allowing Mr. Tsethlikai's prosecution to proceed under these conditions

impermissibly places his constitutional rights at the mercy of the government's self-created funding crisis. If the United States chooses to seek the death penalty against defendants, like Mr. Tsethlikai, who are financially unable to obtain counsel and retain experts on their own, it must also fund the means for those defendants to meaningfully defend themselves. *See* U.S. Const. amend. VI; *Gideon*, 372 U.S. 335 (1963); *Ake*, 470 U.S. 68 (1985); and CJA 18 U.S.C. § 3006A.

This Court has the authority and the obligation to fashion relief that neutralizes the infringement on Mr. Tsethlikai's Sixth Amendment rights. Given the United States' continuing failure to adequately fund the CJA, and now the shutdown of funds for the federal defender's office, the appropriate remedy is an immediate stay of all proceedings. The prosecution cannot continue while Mr. Tsethlikai's defense is unable to function effectively due to lack of resources.

CONSULTATION WITH COUNSEL

Undersigned counsel contacted Assistant United States Attorney Matthew McGinley who indicated that the United States opposes this Motion.

CONCLUSION

Because the CJA funding crisis and subsequent shut down of the federal government denies compensation for defense counsel and other essential members of the defense team and interferes with the defense's ability to retain and compensate necessary experts, Mr. Tsethlikai is actively being deprived of a meaningful defense in violation of the Sixth Amendment, *Gideon v. Wainwright* and its progeny, and the Criminal Justice Act. Accordingly, the Court should immediately stay all proceedings until funding for both the CJA and the federal defender's office is adequately restored.

Respectfully Submitted,

**LAW OFFICE OF ANDREA L. LUEM**
400 S. 4th Street Suite 500
Las Vegas, NV 89101
Phone: (702) 575-0481
Email: andrea@luemlaw.com

Andrea L. Luem
*/s/Andrea L. Luem*

**FEDERAL PUBLIC DEFENDER**
111 Lomas Blvd., NW, Suite 501
Albuquerque, NM 87102
Phone: (505) 346-2489
Email: hadley_brown@fd.org
　　　 aric_elsenheimer@fd.org

Hadley Brown
*/s/Hadley Brown*

Aric Elsenheimer
*/s/Aric Elsenheimer*

14